Mr. Borland, am I pronouncing that right? That's correct, Your Honor. So you've reserved two minutes for rebuttal. That gives you eight to start. And maybe you can start even before the clock goes. Just tell me the correct pronunciation of your client's name. No, I'm sorry. I've got it reversed. What's the... No, that's your client. That's correct, yes. So what's your client's pronunciation? It's Mr. Cerisier. Cerisier. Yes. All right. With that, you may begin. Good morning, and may it please the Court. Nick Borland on behalf of the appellant, James Cerisier. I want to start by highlighting that every NYPD officer knows it is unlawful to point their gun at someone who is compliant and non-threatening, as Mr. Cerisier was. The defendant in this case, Officer Shaw, knew that. He testified as such. It's a straightforward rule. Well, he knew it was against the patrol guide or something, right? That's correct, Your Honor. You said he admitted that he knew it was against the law? No, he admitted that consistent with the patrol guide, it was improper for a police officer to point a gun... Right, but that's not the same as against the law. That's right, and I'm not suggesting, Your Honor, that the patrol guide defines the limits of the Fourth Amendment. But I do think it gets right to the heart of one of the key points made by the city, both below and its briefing here, that a police officer couldn't possibly know that gun pointing in situations like this is improper. The situation here is a traffic stop, right? The person who is being directed to stop is in a vehicle. That's correct. Which could accelerate and strike the officer in seconds, right? This car, I think, looked like a pretty fancy car that would have a pretty good acceleration rate. And so your view is that even in those situations, the police officer just has to be vulnerable and not draw his weapon, even for just a couple of seconds. That's not our view in all cases. I mean, the facts here, accepting plaintiff's facts is true, as this court must in reviewing summary judgment, are not involving a car that was accelerating, veering out of the way, bearing down the road towards the officer. No, but it could, right? I mean, it wouldn't take more than a second or two for a car to do that. It certainly could theoretically happen. But that in such a context, it would really give police officers license to use their guns however they want, point them whenever they want in any traffic stop because every traffic stop involves a large vehicle, which could theoretically accelerate. But I want to stress that those are not the facts here. Here we have a driver who complied the moment he saw the officer down the road. He stopped his vehicle. He then followed every instruction to pull over slowly, avoiding traffic and the officer. And it was at that point, after Mr. Cerusi had complied and was following instructions, had his hands on the wheel and was pulling over, that Officer Shaw apparently grew impatient or for whatever reason drew his weapon and pointed it directly at my client's face. Well, from a distance of what? Well, that's disputed. That's one of the disputed facts. Give us your client's view as we must. I believe it was around 10, 15 feet off to the side of the car at this point. So this is not directly in front of the vehicle. This is off the sort of from the driver's side off the left-hand side. So I just want to stress that when we're evaluating both prongs of qualified immunity, the objective reasonableness test, which converges with the merits, and whether the right at issue is clearly established, we have to be working with plaintiff's facts. And here we're dealing with someone who is nonthreatening and compliant at the moment the force was used, which is the moment we look at when determining whether an officer's actions were objectively reasonable. The officer did not view your client as nonthreatening, right? I mean, the dashboard camera recorded the exchange, and when your client was allegedly coming at 25 miles an hour, 15 to 20 feet from the officer, and didn't initially stop, then stopped, the officer was concerned. Would you disagree with that, or the evidence showed that he was concerned that he was going to get run over? So I believe Your Honor is referring to the audio recording, not the video portion, because this happened off camera, so I just wanted to clarify that. That certainly is an interpretation of the audio, but I want to stress that when- Interpretation or the words, I thought you were going to run me over. I don't know. You know, I don't know. You were trying to run me over. I don't know where you were going towards. You know, I don't know. You were trying to run me over. You were trying to come close to me. I was thinking you were going to run away or try to hit me. That is why I had to take my gun out. You don't dispute that. We don't dispute that that was said. I would point out, Your Honor, that you're referring to the rationalization the officer gave to Mr. Cherousier after the stop, moments before he let him go, after observing that he was a city employee. Certainly we would argue to the jury, and I believe we would be able to convince them that this was a post hoc rationalization that the officer came up with. It wasn't a present sense impression or something like that. I suppose you'd also have to determine whether the officer's subjective belief was objectively reasonable, or is that not part of the equation? So the operative inquiry is whether, knowing the facts on the ground, from the position that the officer was in, standing in his shoes, whether he acted objectively reasonably. And I believe that part of that analysis should take into consideration whether the officer's conclusions, his actions, his determinations based on those facts were objectively reasonable, yes. So let's talk about Girard. That's one where it's not a published opinion, and it post-dates the incident here. But nonetheless, that's where a panel of this court concluded that neither the Supreme Court nor this court had clearly established that a verbal threat combined with display of a firearm without any physical contact constitutes excessive force. Here we don't have a verbal threat. We just have, in the context of a traffic stop, the officer taking out his gun for 7 to 10 seconds, right? That's right, yes. And so if what wasn't clear under Girard meant that qualified immunity was appropriate, why would that not apply here as well? Well, there's two. Setting aside the non-presidential nature of Girard, which Your Honor already highlighted, there are really two issues with Girard. The first is this distinction between cases involving verbal threats and non-verbal, not having verbal threats, is ultimately one without a difference for the purposes of a seizure under the Fourth Amendment. When a gun is pointed, everyone understands that they are seized. It's the quintessential show of authority. What the officer says accompanying the gun pointing does not change the fact that there is a seizure. That's why if you look at the multitude of cases that we have cited from all over the country, I believe there are 16 from other circuits alone that we cite in our papers, none of those draw that distinction or evaluate the verbal threat as part of the analysis. Those all hold that gun pointing in cases involving a compliant, non-threatening person can be a Fourth Amendment violation. The second issue with Girard- But most of the cases you cite are not car stop cases. That's correct. Car stops are different. The Supreme Court has made it very clear. Car stops are different. That's an incredibly vulnerable spot for an officer to be in. The officer doesn't know whether the person in a vehicle has got a weapon or doesn't know whether they're going to use the vehicle as a weapon. And so there are a handful of cases that you cited that do involve interactions in vehicle stops, but those are really distinguishable from the facts here, wouldn't you say? Some of them involve threats. Some of them involve actual uses of force, smashing a window or something like that. And others involve somebody who it's not even a real stop. It's a traffic incident in which a cop gets out of the car and gets into it with the drivers and then pulls out a gun and threatens to kill them or shoot the husband, right? That's correct. It's a Third Circuit or Sixth Circuit case, I forget. That's correct, yes. And it's certainly true that the robust consensus of cases that we have gathered all involve different factual scenarios. But I want to stress that, well, first off, the oldest case we cite, the Third Circuit case, Black v. Stevens, for the proposition that gunpointing can give rise to a Fourth Amendment claim, involved a traffic stop where both occupants of the car had a gun pointed at them by an officer who claimed that his foot was being run over by the driver who was still noncompliant and moving at the time. The jury didn't buy that, ultimately sided with the plaintiffs. But even in that situation. But one case from the Third or Sixth Circuit is not going to do it for you. You basically need a Supreme Court case or you need overwhelming consensus among the lower courts. And so what you've got is some good facts in a Third Circuit and a Sixth Circuit case. And even if we agree with you that those cases stand for the proposition that what the officer did here is wrong, that's enough to make it clearly established that this was wrong? I certainly wouldn't argue that one case from one circuit is a robust consensus. But I want to highlight the reason why we are here today is because the district court concluded, and I want to quote from the opinion at page eight, that the prevailing view among post-Graham courts is that threats of force, including the drawing of a firearm, do not constitute excessive force. That's the Second Circuit's view in Girard, isn't it? The Second Circuit in Girard did not have the benefit of the argument that we are having today, the briefing that has been provided. But that was the conclusion of that panel, right? About the Second Circuit's precedent, yes, certainly. We are not hiding the ball. There is no magic Second Circuit case out there that clearly establishes on its own the gun pointing. If anything, the Second Circuit authority points the other way. Would you agree with that? When referring to its own precedent, yes. But nowhere in Girard was the consensus of other courts, which, again, applying in a variety of circumstances, have said that someone's compliant, someone's not threatening. All right. But we're just asking a police officer who might have a couple of years of college or maybe a college degree, but the police officer to know better than the three-judge panel in Girard. I don't know who was on it, so I don't know. Well, I think we all know that police officers, it's not part of their job description to read circuit cases. It is part of the job description. I don't think the district courts read them either. I'm joking. That's a joke. As someone who practices in this field, I have to admit I don't keep up with all the circuit's decisions either, even on the Fourth Amendment. But who does keep up on that is the law bureau at the New York Police Department. And they're the ones who write the procedures and manuals and training that tell officers that they are only supposed to unholster and point their gun in situations where the use of deadly force would be warranted. Right. But, again, you can see that the patrol guide is not dispositive, right? There might be good reasons and good practices in a highly dense city like New York to have certain procedures in place. But that doesn't mean that the consensus is that noncompliance is a Fourth Amendment violation. I absolutely agree. You already said that. Yes. But I do want to highlight that these two things are in harmony. This consensus of cases in different situations, all involving police officers, all involving individuals who are compliant and nonthreatening, have said there is a Fourth Amendment violation here. And the training that Officer Shaw and all of his colleagues went through says the same. Clearly, that consensus is reflected in the training. And that has to be something that is weighed here when we're considering what's objectively reasonable and what a police officer would know. Other questions from my colleagues? No. All right. We've gone over a little bit, but that was okay because I was peppering you with questions. You've reserved two minutes for rebuttal, Mr. Borland. That gives Mr. Young ten minutes. Good morning, Your Honors. May it please the Court, Philip Young here on behalf of the City of New York. I want to go right to Gerard and point out that Gerard is entirely consistent with what this Court decided in Tarabisi v. Tarot, where the Court was presented with a summary order, Fortunati, that held that there's no clearly established law in the Second Circuit to be free from being subjected to a SWAT team. And although that was a non-precedential summary order, this Court considered it and used it as a basis to conclude that there was no clearly established law in that case. And as Your Honor noted, this Court said essentially it would be unfair to the officer who's not expected to keep up with constitutional law to expect that he would know clearly established law that three judges of this Court could not find. One of the challenges that always comes up in this clearly established law inquiry is sort of the level of generality or specificity, right? And nobody would contend that you need a case with the exact facts, but nobody would contend that broad principles like you shouldn't engage in excessive force are going to give the necessary notice. My sense from your briefing is that your primary argument is a little bit narrower than the way I read the district court's decision, but I want you to tell me if I'm wrong. I read the district court as saying, as a matter of law, there's no clearly established law that, in any circumstances, the display of a firearm isn't actually, and display is a little bit misleading, I guess, because pointing and displaying are pretty different things. But let's say there's no clearly established law that display of a firearm without any physical contact constitutes excessive force. Your brief focuses on the facts of this case and argues essentially there's nothing out there sort of close to this scenario. Are you taking the broader position that we wouldn't be able to come up with a set of facts where pointing a firearm without regard to the level of reasonable perception of threat that the officer has, without regard to the severity of the conduct that the person had engaged in, that it's just not clearly established that you can't point a gun right at somebody's face? No, we're not taking that position, Your Honor. I mean, as we noted, Girard does stand for the proposition that there is no clearly established law as far as verbal threat and display of firearm. We acknowledge that there are other cases out there in other circuits that have found in certain circumstances with certain aggravated factors mere pointing of a weapon can constitute aggravated force or excessive force. So to the extent that the district court seems to say, to take that broader position, you're not endorsing that? Well, I don't think we're either endorsing or rejecting it. We're sort of acknowledging that Girard is out there and Girard says what it says and that there are other circuit cases out there that theoretically could allow this court in a different setting with different facts to conclude that mere gun pointing in a seriously aggravated setting could constitute excessive force. But again, that's not clearly established by either this court or the Supreme Court at this point. Anything else you wanted to comment? Yeah, I just want to briefly address the 16 cases that Your Honor's mentioned and that my opponent was mentioning just to highlight how different they are from the case here. So in many of those cases, most of them, the officers are keeping their guns trained on the individual for minutes or hours versus the 7 to 10 seconds here. In most of those cases, the plaintiff was restrained or otherwise not able to threaten the officers unlike here where Serissier was traveling on a highway in a multi-ton vehicle. Most of those cases, again, the plaintiff was unarmed unlike here. And in many of the cases, the plaintiff wasn't even a suspect to begin with unlike here where Serissier indisputably committed a traffic infraction. So all of those cases are just simply too far afield from the particular facts of this case to really make them relevant. All right. Thank you, Your Honor. So Mr. Borland, you have two minutes for rebuttal. All right. Briefly, Your Honor, a couple of points I'd like to highlight. My opponent just noted that they acknowledged that Girard is there. I believe in the briefing, the district court in the briefing here as well, their argument was that Girard squarely forecloses any Fourth Amendment claim here. And I want to stress again that this court has instructed that a summary order like Girard is a summary order for a reason and it does not have precedential import in cases like this outside the facts of that specific case. Well, I mean, we have said that we can point to summary orders to demonstrate what's not clearly established, right? I would say that it's probative on what was clearly established on the facts in that particular case and with the argument that that court had in that particular case. But if you look at the briefing in that case, if you look at the decision in that case, it does not weigh the consensus of authority from other circuits. Well, it doesn't. Clearly it doesn't. I think that's right. But nonetheless, your outside of circuit cases, as Mr. Young just said, most of those cases are readily distinguishable. There's only a couple that I think you focused on, Third and Sixth Circuit, that seem to be more emphatic. Let's put it that way. Respectfully, Judge Sullivan, I would disagree that they're readily distinguishable in a relevant way. When we're looking at, and again, this is always about measuring the goalposts for what's clearly established and defining the right at issue, which is… But you don't think it makes any difference whether a person is sort of handcuffed prone on the floor, surrounded by officers in the context of a search warrant, as opposed to somebody who's in a vehicle, still in a vehicle that's moving. You don't think that that's a meaningful distinction? It certainly is a meaningful distinction in terms of whether the officer's conduct was objectively reasonable. But as to the question of whether it was clearly established that pointing a gun at a compliant, non-threatening individual, any of those cases that we've gathered clearly have established that, which is why they reference each other in holding that that has long been clearly established. I mean, when we look at these other cases, the Baird v. Renberger case, for example, from the Seventh Circuit, that's one of these search warrant cases that Your Honor is referring to. That court, in holding that it was clearly established, not only by the Seventh Circuit, but by other circuits, it looked at the First, Third Circuit, I believe the Sixth as well, at all these cases in different contexts. And it said that other circuits have also held that pointing guns at persons who are compliant and present no danger is a constitutional violation. But we have to assume compliant and presents no danger. That's correct. So is your position that the officer here just mistakenly misunderstood the situation as threatening? That is certainly what we would be arguing to the jury, yes. And if that's the case, doesn't qualified immunity specifically cover that type of mistake, a known constitutional violation? So if we assume he's mistaken, then how does qualified immunity not apply? That is exactly why qualified immunity, Judge Kahn, can still be raised by defendants after these issues of fact are ironed out by the jury. It would still be decided as a matter of law by the court after trial. But sitting here today where all of the material facts are in dispute, as Judge Vitaliano correctly noted in his opinion, that cannot be decided as a matter of law today whether it was objectively reasonable, and that was a mistake. Because somebody's got to determine whether that expressed fear, given the facts that are found as to what was happening was in fact reasonable. Exactly, including the speed of the vehicle, the relative position of the parties at the time that the force was used. So I suppose your argument would be because the vehicle was stopped in the facts that we have to assume, and because your client was attempting to comply by crossing the live lane that was between him and where the officer wanted him to be. If the officer hadn't pointed the gun, if he had unholstered the gun but not pointed it, would it be the same case? I think it would be a different case. Why? Because the ultimate show of authority that triggers a seizure- So this is unconstitutional, this is okay? Yes. What's the best case for that? I don't have a best case drawing the line between the two, but I think- Or just this, you know, gesturing towards your gun. Well, the average police officer gestures or holds or puts their hand on their gun all the time. That's not the universe we're in at all. When we look at what the Fourth Amendment inquiry starts with, if we're looking at the continuum of a use of force, the starting point is a show of authority. Is unholstering a weapon a type of a show of authority? It could be. I can imagine factual circumstances where that could be the case. Are you saying that there aren't cases where the claim has been made that just touching your gun is a threat or the threat of using a weapon? And if that's the case, how would that have been better? I do not know of those cases. They have not been the focus of the parties below or here on appeal. Because Qualified Immunity instructs courts to look narrow enough at the right at issue to give officers notice of the conduct that's supposedly unconstitutional, we have, of course, been focused on gun-pointing cases, and that's what we've collected. The show of authority that is at issue here, the seizure, is the one that took place when a gun was pointed at my client. So that's what we've been dealing with. All right. Well, thank you both. We will reserve decision. Well argued. Thank you. That concludes the oral argument portion of our calendar. We have two other cases on submission, as I mentioned, and those will be reserved as well. With that, I want to thank our courtroom deputy and ask her to adjourn the court.